**STATE of Iowa, Appellee,**

v.

**Allen Lee HALL, Appellant.**

No. 55845.

Supreme Court of Iowa.

Jan. 16, 1974.

Rehearing Denied March 18, 1974.

Korf, Diehl, Clayton & Cleverley, Newton, for appellant.

Richard C. Turner, Atty. Gen., Fred M. Haskins, Asst. Atty. Gen., and Dennis F. Chalupa, Jasper County Atty., for appellee.

UHLENHOPP, Justice.

The principal legal question in this appeal from a conviction of first-degree murder relates to the effect upon criminal responsibility of a mental condition resulting from voluntary ingestion of a drug. The principal factual dispute is whether defendant Allen Lee Hall did ingest a drug and if so, its effect upon him.

The fact is not disputed that defendant slew Gilford Eugene Meacham in a car at the time and place charged. Defendant left a fingerprint in the car and also an overnight bag containing his social security card. A few days later he turned himself in and voluntarily disclosed that he shot Meacham. At trial, defendant testified about his version of what happened. Much of the testimony was by defendant himself, as only he and Meacham were present at the occurrence.

The State's version is that the homicide was a cold-blooded murder by defendant in the course of robbing Meacham. Defendant was hitchhiking in the West, and Meacham offered him a ride from Oregon to Chicago, with defendant to drive. Defendant was then to split off and hitchhike to his home in North Carolina, while Meacham was to drive on to Connecticut to get married. According to the State, after defendant had passed Des Moines, Iowa, he shot Meacham in the head, robbed him of $208, dumped his body on a side road, drove on to Davenport, Iowa, took a bus from there to Chicago, Illinois, and then hitchhiked to the Southwest. The State relies on the rule that the jury could believe some parts and reject other parts of defendant's testimony. 88 C.J.S. Trial § 214 at 484–485 ("The jury are not required to believe everything said by any witness; they may accept that which they believe to be true and reject that which they believe to be untrue").

Defendant's version is more extensive. According to him, he grew up in North Carolina, his father abandoned the family penniless when defendant was small, defendant's stepfather later shot defendant's dog when it was frothing at the mouth with rabies, leaving an indelible impression on defendant, defendant subsequently dropped out of school but eventually obtained a high school equivalency certificate, he served in the army but was discharged as undesirable, at one time he drove a car in Utah without the owner's consent and was convicted and sentenced to ten years, and at another time he was convicted of a federal offense for which he received five years probation that he violated by leaving North Carolina on the present occasion. He testified that he was married but had no children, worked in a factory in North Carolina, lived with his wife in that State, and on this occasion had left to hitchhike through the West.

Regarding the incident involved here, defendant testified that casual acquaintances in California gave him a pill and told him it was a "little sunshine" and would make him feel "groovy." He met Meacham in Oregon and they made the arrangement for the trip east. Meacham had a pistol. Defendant drove all the way to Iowa without rest and was exhausted. He testified he took the pill at Des Moines, it made him feel funny, and the road turned different colors and pulsated. Meacham was sleeping on the passenger side. Defendant testified he heard strange noises from Meacham's throat, like growling. Meacham's face grew and his nose got long, and his head turned into a dog like the one defendant's stepfather had shot. Defendant testified he got scared, picked up Meacham's gun, and shot him three times.

Defendant stated he did not remember much that happened for awhile. The next

he clearly remembered anything he was in a cemetery at What Cheer, Iowa. He testified he had periods thinking Meacham was human and periods thinking Meacham was a dog. He drove back to the highway and traveled awhile, then turned off on a sideroad and removed Meacham's body from the car.

Defendant testified further he drove to What Cheer and tried there to wipe the blood from his hands. He then returned to see if Meacham was alive, kicked something in the road, saw it was Meacham's billfold, and took it. He removed the money from the billfold, discarded the billfold itself, and later used some of the money and threw away some of it. He also threw away the gun.

Defendant testified he drove to Davenport, abandoned the car, took a bus to Chicago, hitchhiked through the Southwest, and turned himself in to officials in the State of Nevada. He voluntarily told officers about the incident, although in his original version he did not say anything about the claimed pill or its aftermath.

The County Attorney of Jasper County, Iowa, charged defendant with murder. A separate trial was held on the question of defendant's sanity to stand trial. A jury found him sane. Defendant pleaded insanity at the time of the act and stood trial on the murder charge; a jury found him guilty of first-degree murder. After the trial court overruled defendant's motion for new trial and sentenced him, he appealed.

In this court defendant presses four principal contentions. First, the trial court should have instructed the jury that defendant's drug intoxication, if proved, required an acquittal. Second, the trial court erred in instructing that defendant's drug-induced intoxication, if established, could not reduce the offense below murder. Third, the court erred in other instructions. And fourth, the record does not contain substantial evidence of first-degree murder.

■ I. *Drug Intoxication as Complete Defense.* The case is different from the usual one in which the accused contends only that use of alcohol or other drugs prevented him from forming specific intent. Here defendant first contends the drug caused temporary insanity, which constitutes a complete defense. Defendant is right that insanity, if established, is a complete defense. Under our law the test of insanity is "whether defendant had capacity to know the nature and quality of his acts and [the] distinction between right and wrong." State v. Harkness, 160 N.W.2d 324, 334 (Iowa). In addition to himself as a witness, defendant introduced testimony by two physicians who opined the drug was LSD and answered hypothetical questions about defendant's mental condition. By himself and those witnesses, defendant adduced substantial evidence which would meet the Harkness test in an ordinary case of an insanity defense. This evidence assumed the truth of defendant's testimony that he ingested the drug and sustained hallucinations as a result.

Defendant requested an instruction on insanity as a complete defense, tailored to include temporary insanity induced by drugs. The trial court refused it, and instructed that the jury should consider the claimed mental condition in connection with intent, as reducing the offense but not as exonerating it.

■ This court has held that a temporary mental condition caused by voluntary intoxication from alcohol does not constitute a complete defense. State v. Booth, 169 N.W.2d 869 (Iowa); State v. Johnson, 215 Iowa 483, 245 N.W. 728. Is the rule the same when the mental condition results from voluntary ingestion of other drugs? We think so, and the cases so hold. Commonwealth v. Campbell, 445 Pa. 488, 495, 284 A.2d 798, 801 ("there should be no legal distinction between the voluntary use of drugs and the voluntary use of alcohol in determining criminal responsibility"); People v. Corson, 221 Cal.App.2d 579, 34

Cal.Rptr. 584; DeBerry v. Commonwealth, 289 S.W.2d 495 (Ky.); State v. Bellue, 194 S.E.2d 193 (S.C.). See State v. Christie, 243 Iowa 1199, 53 N.W.2d 887, on reh. 54 N.W.2d 927 (alcohol and phenobarbital); State v. Church, 169 N.W.2d 889 (Iowa) (glue sniffing); State v. Clark, 187 N.W.2d 717 (Iowa) (tranquilizer).

Defendant does not contend that extended use of drugs caused him "settled or established" insanity. See State v. Booth, supra, 169 N.W.2d at 873. He does argue that he did not take the pill voluntarily. See State v. Christie, 243 Iowa 1199, 53 N.W.2d 887. But assuming he did take a drug, according to his own testimony no one tricked him into taking it or forced him to do so. Such is the language of defendant's own citations involving involuntary intoxication. People v. Nichol, 34 Cal. 211, 215 ("fraud, contrivance, or force of some other person"); McCook v. State, 91 Ga. 740, 17 S.E. 1019 (same); Bartholomew v. People, 104 Ill. 601, 606 (same); Choate v. State, 19 Okl.Cr. 169, 177, 197 P. 1060, 1063 ("fraud or artifice"); 22 C.J.S. Criminal Law § 69 at 220–221 ("being compelled to drink against his will, or through another's fraud or strategem"— "fraud or duress"); Annot. 30 A.L.R. 761, 764 ("by strategem, or the fraud of another"). Defendant did not take the pill by mistake—thinking, for example, it was candy. If his own testimony is believed, he knew it was a mind-affecting drug. See Bennett v. State, 161 Ark. 496, 257 S.W. 372 (no excuse that whisky had different effect than accused anticipated, if he knew it was whisky); Commonwealth v. Campbell, supra, 445 Pa. at 495, 284 A.2d at 801 (LSD—"nonpredictability of effect on the human body is devoid of any adequate legal justification based upon legal precedent, or reason, or policy considerations for a radical change and departure from our law of criminal responsibility").

We hold that the trial court properly refused the requested instruction.

**II.** *Instruction on Legal Effect of Mental Condition.* Defendant's next contention takes us another step into the legal effect of voluntary use of drugs. The trial court submitted to the jury forms of verdict for both first- and second-degree murder, for manslaughter, and for acquittal. In its instruction on defendant's claimed mental condition from taking a pill, the trial court instructed that "no amount of voluntary use of drugs can entirely excuse a *murder* and thereby entitle a slayer to an acquittal." (Italics added.) Defendant contends this sentence prevented the jury from finding him guilty only of *manslaughter* as a result of his mental condition—as the jury was prevented, on account of a claimed emotional condition, by the instructions in State v. Gramenz, 256 Iowa 134, 126 N.W.2d 285. The State claims, on the other hand, that the instructions as a whole permitted the jury to return manslaughter if they found defendant's claimed mental condition did exist.

If we accept defendant's reading of the instruction we must inquire, does voluntary drug intoxication permit a jury to reduce a homicide to manslaughter? Turning again to the analogy of intoxication resulting from alcohol,

It is now generally held that intoxication may be considered where murder is divided into degrees, and in many states, may have the effect of reducing homicide from murder in the first degree to murder in the second degree. In fact, in most states the only consideration given to the fact of drunkenness or intoxication at the time of the commission of the homicide is to enable the court and jury to determine whether the prisoner may be guilty of murder in the second degree, rather than of murder in the first degree. The rule followed by most courts is that intoxication will not reduce a homicide from murder to manslaughter. 40 Am.Jur.2d Homicide § 129 at 420–421.

See also 40 C.J.S. Homicide § 5 at 831 ("Voluntary intoxication does not of itself negative the malice required to constitute murder in the second degree and thereby reduce murder in the second degree to voluntary manslaughter."); Annot. 12 A.L.R. 861, 888 ("the great weight of authority is that intoxication will not reduce a homicide from murder to manslaughter"), 79 A.L.R. 897, 904 (same).

Some jurisdictions, however, permit intoxication to be considered on whether the accused acted from provocation or from malice, when he contends he was suddenly provoked to kill and sufficient provocation appears:

> Where adequate provocation for the homicide existed, but it is uncertain whether accused acted under such influence or was actuated by prior malice, the fact of intoxication may be considered in determining whether he acted under the influence of the provocation rather than as a result of the malice. . . . There is, however some authority to the contrary. 40 C.J.S. Homicide § 5 at 832.

Iowa law was settled in accordance with these principles in the leading case of State v. Pierce Wilson, 166 Iowa 309, 144 N.W. 47, on reh. 147 N.W. 739. After canvassing the authorities, this court there upheld an instruction which limited consideration of voluntary intoxication to willfulness, deliberation, or premeditation, for first-degree murder. This court held that intoxication does not negate malice, for second-degree murder. On rehearing, the accused urged that his intoxication should be considered in connection with provocation to kill, under his contention that he was at most guilty of manslaughter because he had been suddenly provoked. This court overruled the petition but held:

> It needs hardly to be said that if a drunken man takes the life of another, unaccompanied by circumstances of provocation or justification, the jury will be warranted in finding the existence of malice, though express malice has not

been proven. But if there is evidence of provocation which, if acted upon immediately by a sober man, would be regarded as sufficient to reduce the offense to manslaughter, and the inquiry is whether the accused actually acted thereon, it is held by the weight of authority that evidence of intoxication may be considered in deciding whether the fatal act is to be attributed to malice, or to the passion of anger, excited by the previous provocation; such passion or anger being more easily excitable in an intoxicated person than in one who is sober. . . .

> *This much has been said to indicate when and for what purpose evidence of intoxication may be considered in determining whether the killing was murder in the second degree or manslaughter.* 166 Iowa at 327–328, 147 N.W. at 740 (italics added).

The court has cited the Pierce Wilson decision on this rule in subsequent decisions, and it stands as the Iowa law. State v. Johnson, 215 Iowa 483, 245 N.W. 728; State v. Glenn Wilson, 234 Iowa 60, 11 N.W.2d 737; State v. Gramenz, 256 Iowa 134, 126 N.W.2d 285. In Johnson the question was not squarely presented but this court held the trial court's instruction was as favorable to the accused as he could require. In the Glenn Wilson case, this court upheld the defendant's contention that the trial court should have instructed on the subject of intent even though requested instructions contained erroneous statements of law. This court held in particular that the trial court should have instructed along the lines of the accused's third requested instruction which was patterned on the one approved in State v. Pierce Wilson, allowing intoxication to be considered on specific intent for first-degree murder. In Gramenz, the accused contended that intoxication could reduce a homicide to manslaughter but the question before this court was whether an emotional condition could reduce homicide to manslaughter, and this court held it could not. All of these cases cited State v. Pierce

Wilson approvingly, the Glenn Wilson case quoted it at length, and none of them overruled it.

In those cases in which an accused claims that sudden provocation reduces the homicide to manslaughter, State v. Pierce Wilson does permit intoxication to be considered on whether the defendant did in fact kill in the passion of anger brought on by provocation which would be sufficent if acted on by a sober man. We do not have such a case here.

Accepting defendant's reading of the challenged instruction in the present case, in order to uphold his contention we would have to overrule State v. Pierce Wilson. This we are not disposed to do. That decision represents the view of a substantial majority of the jurisdictions, and we adhere to it. We therefore reject defendant's contention.

▮ III. *Other Instructions.* Defendant took some exceptions to instructions before they were read to the jury and then attempted to enlarge on his exceptions in his motion for new trial. The latter he could not successfully do, as the trial court could no longer change or expand the instructions before reading them to the jury. State v. Buchanan, 207 N.W.2d 784 (Iowa). On this basis we cannot uphold defendant's contention relating to the trial court's instruction on credibility.

▮ Another of defendant's contentions relates to an instruction on robbery. The trial court submitted to the jury the issue of homicide in the commission of robbery, and defined robbery in terms of the statute, § 711.1, Code 1973. Defendant now contends that the court should have enlarged on the instruction. But this late contention that the instruction should have been more explicit and detailed is not permitted. State v. Hraha, 193 N.W.2d 484 (Iowa).

We have however examined defendant's present contentions regarding these instructions but find the contentions are not meritorious.

IV. *Sufficiency of Evidence.* Defendant's specific complaint in his last contention is not clear. He states:

The verdict of the jury was not based upon the evidence, was arrived at through inferences and presumptions and shows the bias, prejudice, malice and revenge of the members of the jury towards the defendant and the jury's lack of thoughtful consideration of all the evidence presented.

▮ If defendant is asserting that the evidence is insufficient to generate a jury issue, his assertion cannot be sustained. The State rightly claims that the jury was not required to accept all of defendant's testimony. In re Paquin's Estate, 328 Mich. 293, 303, 43 N.W.2d 858, 862 ("The question of credibility is always one for the jury who may not accept all or any part of testimony that they believe untrue."); Wray v. Ferris, 187 Okla. 428, 430, 103 P.2d 942, 945 ("The jury, in arriving at a verdict, were not bound to accept as true the evidence of any witness, but could reject all or any part thereof, and give such weight thereto as in their judgment, taking into consideration the circumstances and physical facts, it was entitled to receive, and from the evidence as a whole arrive at their verdict."); Di Benedetto v. Milwaukee Electric Ry. & Light Co., 149 Wis. 566, 570, 136 N.W. 282, 284 ("The jury were not compelled to believe, in their entirety, the statements of either of the participants.").

▮ On the evidence here, the jury could reasonably find that defendant killed Meacham in the perpetration of a robbery. Such a homicide constitutes first-degree murder. Code 1973, § 690.2; State v. Brown, 253 Iowa 658, 113 N.W.2d 286. Moreover, defendant used a deadly weapon and had opportunity to deliberate; Meacham was asleep when defendant shot him. The rule is that "the willful use of a dead-

ly weapon or other instrument likely to cause death, with opportunity to deliberate before it is used, is evidence of malice, deliberation, premeditation and intent to kill." State v. Gilroy, 199 N.W.2d 63, 66 (Iowa). Such evidence, if believed, is also sufficient to warrant a verdict of first-degree murder. § 690.2; State v. Gilroy, supra; State v. Tice, 257 Iowa 84, 130 N.W.2d 678.

■ If defendant is asserting in his last contention that the jury was simply wrong in its findings on the evidence, then his recourse was to move the trial court for a new trial on the ground that the verdict is contrary to the evidence or that he did not receive a fair trial. Code 1973, § 787.3(6) and (8). He made and urged those grounds in a motion before the trial court, but the court overruled it. Trial courts are in a better position than we are to judge such motions and they have considerable discretion. State v. Carter, 158 N. W.2d 651 (Iowa). From our examination of the evidence and the proceedings, we cannot say the trial court abused its discretion.

We have carefully considered all of the other points defendant argues but do not find merit in them.

We find no error.

Affirmed.

MOORE, C. J., and REES, REYNOLDSON, HARRIS and McCORMICK, JJ., concur.

LeGRAND, MASON and RAWLINGS, JJ., dissent.

LeGRAND, Judge (dissenting).

I dissent from Divisions I and II of the majority opinion because of its erroneous treatment of defendant's claimed defense of insanity. Consequently, I dissent, too, from the result.

The insanity issue arose at trial because plaintiff testified he had ingested a quantity of LSD shortly before the events in question without knowing what it was and without realizing its possible harmful effects. The majority concedes there was ample medical testimony produced by defendant as to the properties of this hallucinogenic drug to support a finding defendant was suffering from a mental illness or temporary insanity and to require its submission to the jury. However, the majority then deprives defendant of this defense by holding his condition resulted from the voluntary ingestion of drugs, which it equates with voluntary alcoholic intoxication.

I find this portion of the majority opinion unacceptable on two grounds. First, I cannot agree that drug intoxication should be treated the same as that resulting from the use of alcohol. Second, even assuming the two are legally indistinguishable, the evidence here presents a fact question on the voluntariness of defendant's conduct, which should have taken the issue to the jury.

At the outset let me acknowledge that much of defendant's evidence is unlikely, even incredible. However, these are matters of credibility for jury determination. Like the majority, I assume the verity of his testimony for the purposes of this appeal. It is perhaps worthy of note here that the trial court expressed misgivings about this matter and decided with reluctance not to give the insanity instruction which defendant requested. I believe it should have done so.

I. My first disagreement with the majority opinion deals with its premise that drug intoxication and alcohol intoxication are legally the same when considering them as a possible defense to the commission of a crime. There is authority to support that view, although not as much as the majority says there is. For instance, the majority seemingly relies on three pre-

vious decisions of this court, none of which touches the issue at all.

They are State v. Christie, 243 Iowa 1199, 1208, 1209, 53 N.W.2d 887, 891, 892, On Rehearing, 54 N.W.2d 927 (1952). In that case the only claim of intoxication was one resulting from drinking beer. There is only a single reference to, and no discussion of, the use of drugs. The opinion is not based, either wholly or partially, on the use of drugs.

The next Iowa case cited is that of State v. Church, 169 N.W.2d 889, 893 (Iowa 1969). Again, the result turns on intoxication from drinking beer. The sole reference to drug use is this statement about glue sniffing at page 894 of 169 N.W.2d:

"As to the matter of glue sniffing, there is no evidence of the effect it has upon those who indulge in it, much less that it causes intoxication. Nor is it suggested the matter is of common and general knowledge so judicial notice may be properly taken of it."

The use of drugs was not a factor there.

The last Iowa case is State v. Clark, 187 N.W.2d 717, 719 (Iowa 1971), where defendant requested an instruction on intoxication from the use of drugs. We did not decide the issue because it was not preserved for review. However, we did say at pages 719 and 720 that such a condition, if it existed, would "seem to relate more to a mental condition than to a state of intoxication"—an observation more favorable to defendant's position here than to the State's.

Not only do these cases fail to lend substance to the majority's position, but other authorities relied on are equally unimpressive, except Commonwealth v. Campbell, (1971), 445 Pa. 488, 284 A.2d 798, 801. Even that case drew a hesitant special concurrence from one member of the court, who went along with the result only because he felt the "present state of our scientific knowledge" did not permit a distinction between the use of alcohol and the use of drugs to be made. South Carolina apparently adopts that same view. See State v. Bellue (S.C.1973), 194 S.E.2d 193, 195.

However, the majority also cites People v. Corson, (1963), 221 Cal.App.2d 579, 34 Cal. Rptr. 584, 587. While it is true the court there held voluntary intoxication resulting from either liquor or drugs is no defense, that case is of small help here because it was based upon a California statute which has no counterpart in this state.

De Berry v. Commonwealth, (Ky.1956), 289 S.W.2d 495, 496, is also cited by the majority as supporting its conclusion. On the contrary, I find it more helpful to defendant, as will be pointed out later.

On the other side of the coin are cases like State v. Flores, 82 N.M. 480, 483 P.2d 1320 (1971) where, under circumstances quite like those here, failure to instruct on the issue of insanity was held to be reversible error.

And in State v. Trantino, 44 N.J. 358, 209 A.2d 117, 123 (1965), the New Jersey Supreme Court held the question of temporary insanity allegedly resulting from the use of liquor and dexedrine had been properly submitted for jury determination.

I believe the Pennsylvania court is guilty of serious overstatement in Commonwealth v. Campbell, supra, 284 A.2d at 801, when it says the "overwhelming" view is that there is no distinction between alcoholic intoxication and drug intoxication. The present state of the case law is not nearly so one-sided. See State v. Rippy, (N.C. 1889), 10 S.E. 259, 261; Moss v. State, (1910), 57 Tex.Cr.R. 620, 124 S.W. 647, 648, 649; Edwards v. State, (1897), 38 TexCr.R. 386, 43 S.W. 112, 113.

I point out, too, that the problem presented here was recognized (but not decided) in Pierce v. Turner, (10 Cir. 1968), 402 F.2d 109, 113, cert. denied 394 U.S. 950, 89 S.Ct. 1290, 22 L.Ed.2d 485 where the court said:

"We anticipate, of course, that the demands of due process may require ad-

justments and refinement in traditional and 'stock' instructions on the subject of criminal responsibility in view of the frightening effects of the hallucinatory drugs."

I believe the time has come for this "adjustment and refinement" in our instructions dealing with this subject. The fallacy in the majority's position is that it puts the issue on a *time* basis rather than an *effect* basis. It says the use of drugs is no defense unless mental illness resulting from long established use is shown because that's what we have said of alcoholic intoxication. See State v. Booth, 169 N.W. 2d 869, 873 (Iowa 1969). But we have said that about alcohol because ordinarily the use of alcohol produces no mental illness except by long continued excessive use. On the other hand that same result can be obtained overnight by the use of modern hallucinatory drugs like LSD.

The reason for our alcohol-intoxication rule disappears when we discuss the use of these drugs. See G. Lunter, "The Effect of Drug-Induced Intoxication on the Issue of Criminal Responsibility," 8 Cr. Law Bulletin, page 731 (1972) and Comment in 17 DePaul Law Rev., page 365 (1968), "LSD—Its Effect on Criminal Responsibility."

Several quotations from the latter are significant. At page 370 the author says:

"LSD can cause a breakdown in the normal functioning of the mind because hallucinations and a complete break with reality is one result of the use of the drug."

At page 371 this appears:

"The LSD reaction may be equated, for legal purposes, with delirium tremens. In many ways they have the same effect on the human mind, and it would appear that both should render the subject legally insane."

Our intoxication rationale as applied to alcohol simply does not fit the use of modern hallucinatory drugs; and it was never meant to. It was adopted before such drugs, as we now know them, were in common use. That is why I would say they *are* dissimilar and should be so regarded. There is no justifiable reason for equating the effects of so-called "hard" drugs, particularly those classified as hallucinatory, with the use of alcohol.

In the present case there is testimony of some 90 drug categories. Each has its own properties and each has its own effects. To treat all alike simply because each is classified generally as a drug strikes me as a judicial cop-out which completely disregards the realities of the situation.

In the case of alcohol, we have long experience which teaches us the usual and ordinary effects of alcohol upon the human mind and body. We are therefore justified in formulating general rules as to alcoholic intoxication, even though they may not operate with precise fairness in every case. We do not yet have the same scientific reliability on the effect of the use of drugs as far as criminal responsibility is concerned. But this should not tempt us to slough the matter off by lumping *all* drugs together with alcohol, where obviously many of them do not belong.

I would doubt a rule which affords a defendant the right to show temporary insanity under the standards announced in State v. Harkness, cited in the majority opinion, even though that condition may have resulted from a voluntary dosage of hallucinatory drugs. See State v. Flores and State v. Trantino, both supra.

II. Assuming, however, there is no merit to what I have said in Division I, there is still another reason why I cannot agree with the majority opinion. Even under that view, it is only *voluntary* intoxication which may not be relied upon as a defense to the commission of a criminal act. The majority finds that the use of drugs here was voluntary. I believe that finding

entirely overlooks the real import of the evidence.

The testimony shows defendant took a pill which he knew to be a drug but which he did not know to be LSD and which he testified he thought to be harmless, although he had been told it would make him feel groovy. There is nothing to indicate he knew it could induce hallucinations or lead to the frightening debilitating effects of mind and body to which the doctors testified. The majority nevertheless holds the defendant's resulting drug intoxication was voluntary. I disagree.

Surely, a court which has so zealously guarded unwary defendants from "voluntary" guilty pleas made without full realization of the consequences (State v. Sisco, 169 N.W.2d 542 (Iowa 1969)) and which has rejected any attempted waiver of constitutional rights unless knowingly and intelligently made (State v. Niccum, 190 N. W.2d 815, 822 (Iowa 1971))—surely that same court will not now say this defendant *voluntarily* drugged himself because he willingly swallowed a pill without knowledge of its nature and while ignorant of its potentially harmful effects.

In other words, does voluntary in this context refer to the *mechanical* act of ingesting the pill or does it refer to a willing and intelligent assumption of the possible harmful consequences of that act?

I am convinced voluntary as here used should relate to a knowledgeable acceptance of the danger and risk involved. Applied to the instant case, that rule would demand submission of the issue to a jury. See De Berry v. Commonwealth, (Ky. 1956), 289 S.W.2d 495, 497, where the court held one who commits a crime under the influence of drugs should be held guilty if he takes the drug *knowing the effect it is likely to have*. See also Saldiveri v. State, (Md.App. 1958), 217 Md. 412, 143 A.2d 70, 77, where it was held administration of an excess dosage of drug by mistake could not result in voluntary drug intoxication.

In my opinion the trial court erred in holding defendant was not entitled to have the issue of temporary insanity submitted to the jury under proper instruction. I would reverse and remand for a new trial, because of the court's failure to give such an instruction.

MASON and RAWLINGS, JJ., join in this dissent.